Coleman v. Children's Hospital of Philadelphia Mark Natale, Appellant, Alamut Law Good morning, Your Honors. My name is Jessica Rickaball, and I represent Appelli, the Children's Hospital of Philadelphia. I want to start by addressing the factual discussion that Your Honors were having with my opposing counsel. Their arguments are all based on speculation upon speculation that all come from plaintiff's testimony. There isn't any outside evidence outside of her own testimony that any of the things that she was saying are true. Why isn't that enough? If this is a she-said-she-said case, isn't that classically what we put in front of juries and Ms. Rickaball? Don't we tell district court judges, hey, you don't get to decide who to believe and who not to believe. If she's got a side of her story and they've got a different side of the story, we let 12 good people and true sit down and hear it and decide who they think is more believable. Your Honor, there's case law in this circuit that speculation that's only coming from the plaintiff's testimony is not enough. It's not speculation. It's that she's got a story. Her story is, and I can, nobody wants to hear me do it, but I can read you the record sites. There's a litany of things where they ask in detail at the deposition what happened at the meeting. They questioned whether I worked the hours. I assured them I had worked the hours. There's no, you know, they say, we asked, were you on site? She says, in effect, no. They asked whether I worked the hours. Those, and I did work the hours. She has a story to tell and it's not speculative. It is different and significantly different than the story told by Ms. Menke and the others. I'm struggling with the assertion that it's all just speculation. Why is it not speculation? It's two people with divergent accounts of what happened. And that, Your Honor, can occur in any employment conversation with a supervisor and an employee. There has to be something more than just a disagreement about something that's completely unrelated to the leaves. There's nothing to tie the leaves. Completely unrelated to the leaf. I mean, that's their argument. I don't think you can say in response to their argument, it's all speculation, go away. You have to explain to me why at the summary judgment stage where every inference is to be drawn in favor of the non-movement, every reasonable inference is to be drawn in favor of the non-movement, why there is not a jury issue on the, and I'm focused on retaliation here. I'll give you for the sake of discussion that once your gallbladder is out, you're not disabled. And she said, and she did say, after I got back to work, I was effectively recovered. I was better. But leave that to the side and focus on retaliation. What is it that makes you say all that stuff that they say about inferences, they're not really inferences that could be drawn? It's not a fair inference to say that when they ask, are you doing this job? Are you up to this job? They're focused on her having taken leave. Instead of saying, it's just a nice thing to say. First, if you look at the timing of when things happen, the FMLA leave was from October of 2020 to November of 2020. The adverse employment action took place three months later. And there's no case that Ms. Coleman's counsel has cited that suggests that that time in between leave and action is... I'll give you that. The seven weeks timing, timing alone is not indicative here. So you've got that in your corner. Now, they say Ms. Coleman spoke with Ms. Menke. Ms. Menke knew that nurse supervisors were working from home and indeed had encouraged it. That's in the record. That's her statement under oath. I accept that as true. And that Menke only asked her at that confrontation interview on February 22nd whether or not she had worked the hours. Does it not create enough of a fact issue about the motivation for the firing for a jury to decide whether Ms. Menke's version of the facts, in fact, being so different, is indicative that she was out to get her? And that the whole shoddy, lamentable, as your colleague would put it, investigation furthers that inference. If they really wanted to get to the bottom of it, they'd have done more. But they didn't. This was all a put-up job. Your Honor, no. Because if that's the standard that the plaintiff is allowed to just speak and not have any other outside evidence aside from her own testimony to back it up, then nothing is ever going to be decided at the summary judgment stage. Everything will get to a jury. The other issue here is that the things that she is contesting are dubious, are things that if, in fact, her testimony was accurate, there would be some outside evidence to support it. For example? For example, she claims that she could work from home whenever she wanted. If that were true, she could have gotten testimony from a colleague that said that. Or some sort of email exchange. You're asserting that it's not enough for her to say it. Is her evidence somehow inadmissible? No, her evidence is not inadmissible. But it strains credibility in this context. It strains credibility. You've just put your finger on it. Is this a credibility dispute? Your Honor, I think at any time where there's a dispute among what are the facts, that's potentially a credibility dispute. And that's what the plaintiff is always going to say. But here we're talking, I think the plaintiff here is setting a bar too high for CHOP. The plaintiff is suggesting that we should have had a work from home policy written down. Yes. Not only suggesting it, they're saying, I think, that if you're really going to hold people to something like that and fire them, you ought to have that. But stick with me for a second when you say it's just a bar too high. You could win this at trial. You're trying to avoid trial. That's what we're here to talk about. It's not that they win if they win on this appeal. It's that you have to try it to a jury. Why should a credibility issue be something properly undertaken by a district court judge? Your Honor, there has to be something to tie it to the leaves. It's her testimony about what she was told. And she's come out and said, these are the things I was told. And look, they don't have anything to show that they told me anything different. Indeed, they don't even have a written policy. The things that she testifies about that she was told have no connection to her leaves. All right, so that's the causal connection. I'd just like to ask a couple questions to make sure that I understand what's at issue on this appeal. It's my understanding from reading the record that the district court made an alternative, talking first about ADA discrimination. It's my understanding the district court made an alternative holding that Ms. Coleman's alleged disabilities were not a determinative factor in the hospital's decision to terminate her. Is that right? Yes, Your Honor. Is that live on appeal? Did your friend on the other side even appeal that alternative holding? No, Your Honor. Okay, next question. On ADA retaliation, the district court made a holding that Ms. Coleman did not engage in protected employee activity. Is that right? That's correct, Your Honor. Is that live on appeal? No, Your Honor. All right, so then all that's really live on appeal is the FMLA retaliation, correct? Correct, Your Honor. All right, then on the FMLA retaliation, there's an argument that, as I understand it, and we'll hear from Mr. Natale on rebuttal, but it's my understanding that she claims that she was retaliated against because she took FMLA leave, correct? That's her argument. And I think your argument, as I understand it, is that there's no temporal proximity between the taking of the FMLA leave and the adverse employment action. That's a crucial part of it, Your Honor, but also there's just no statements from her superiors. The issue of leave never came up in any discussion about her time cards or whether the hours that she had worked all worked within the hospital. And a good faith, honest belief, even if it's mistaken, is not discriminatory. She does not get past the summary judgment stage by making an inference that has no link to her discussions about her time cards other than her own speculation that there's a link. Well, Mr. Natale made an argument that while the person who, Saunders, who caused the adverse employment action was unaware of the leave, that Saunders was acting as the cat's paw for Menke. Why is he wrong about that? He's wrong about that because, one, the time cards, even though he asserts that they're only from the parking garage, that's not accurate. The time cards that the exits in and out of CHOP also included in and out of the hospital. I don't want to interrupt, but I'm going to because that's not answering the question, and I really do want to hear the answer. What is it about, what do you rely on to say he's wrong that the HR rep was a cat's paw for Menke? Sorry for not making this clear up front, Your Honors. Those time records were provided to Ms. Saunders, who, again, testified that she didn't know the plaintiff had even taken any FMLA leave because FMLA leave is done through a third-party provider. You know. I understand that. The argument being made is Saunders may have been kept in the dark, but that doesn't matter because the moving hand here was Menke, and the assertion that your colleague on the other side keeps going back to is the causal link is an inference to be drawn from the fact that she was viewed by all accounts as a very high-performing employee, encouraged to take care of her education, on track for promotion, and it's only when she comes back from leave that atmospherics and treatment of her change. And there's an inference to be drawn there. It's not that there's no connection to the leave. You can infer it's connected to the leave because the way they treated her before the leave and the way they treated her after the leave are very different. That's the inferential connection that they keep urging on us. That's what it would be helpful for you to speak to, in particular in answering Judge Hardman's question about Menke being the moving force. With respect to the discussions about promotion, Ms. Menke testified that there were discussions both before and after she came back from leave, but that there wasn't any opening for Ms. Coleman to be promoted after she came back from leave, and that was within a three-month time frame. What do we make of her? You're giving us Menke's testimony. Her testimony is they treated me differently. They began questioning my competency and how I was doing and then questioning how I kept my time, et cetera. That's her side of it. The only things that Ms. Coleman points to in her testimony with respect to Ms. Menke after leave is, one, a weirdness at which she testified, I wasn't sure as to what that entitled or what that came from, and that's on page 221 of the appendix. And that's also in relationship to a single instance where a plaintiff testified that Ms. Menke asked her whether or not she could run a meeting. It wasn't about whether or not she could do her job as a whole. It was just about whether she could run a meeting. And that could, if in fact true, even if you assume that that could have taken place per plaintiff's testimony, plaintiff doesn't offer anything to suggest why that has to be related to the leaves. And Ms. Menke wasn't even asked about that interaction in her deposition. So there's just nothing that, and furthermore, plaintiff testified, as the district court pointed out, that on that question about whether you could do your job, she was asked whether or not she believed Ms. Menke had a concern about whether she had recovered from surgery, and Ms. Coleman said no. And that's at page 222 of the appendix. Okay. Anything else? No. All right. Thank you, Ms. Rickabaugh. We appreciate your argument. Thank you, Your Honor. Mr. Natale, could I ask you to begin with addressing the colloquy I had with your friend on the other side about whether these ADA claims are even live, because there was no effort in the appeal in your briefing to address the alternative holdings. I can repeat them if you need me to. Could you repeat the alternative holdings? Sure. So the alternative holding on the ADA discrimination claim was that Ms. Coleman's alleged disabilities were not a determinative factor in the hospital's decision to terminate her. So I'd like you to show me where that was raised on appeal, if it was. And I'd also like you to show me where, in respect to ADA retaliation, the district court held that your client did not engage in protected employee activity. So I'd like you to tell me where that was raised. Because, you see, if those alternative holdings weren't challenged, then the decisions, the judgment stands on those, even if you're correct about what you did challenge. Understood, Your Honor. So when it comes to the first part about whether or not the determinative factor analysis was raised, I believe this was a mistake from the district court in their ruling as well, which is that they parsed out. I didn't ask you about the district court's mistake. I'm asking where did you raise it. Understood, Your Honor. Just point me in your brief. It's the page number, the citation, whatever. Just show me where you raised it. My contention is that the portion of my brief that talks about the pretext is raising the determinative factor analysis. Could you kindly direct me to a page number and a place on the page? Let me just make sure I have the right page number for the heading, Your Honor. If you look at page 23 and 24 where I talk about the causation on ADA claims, the issues are one and the same. That it's all of the same evidence that proves determinative factor, that proves pretext, that proves motivating factor. The reason why I brought up the district court's error judge was that in that alternative hearing, I felt they erred in parsing that all out when the case law is clear that you can use evidence of pretext to prove a determinative factor. So it's one and the same. Pretext is step three. The determinative factor is your case in chief. But the case law is clear that by establishing pretext, the same evidence that establishes pretext can establish a determinative factor. Are you referring to Farrell? Yes, Judge. So my contention is that by raising the pretext arguments, you're raising the determinative factor analysis because it's the same analysis. All right. Did you use the word determinative anywhere, or we're supposed to sort of discern that? You hit the ball on us on determinative factor, or was it just an omission? Whether or not I used the word determinative factor, Judge, is not something that I can answer right here. Can we agree that whether a disability is a determinative factor is a phrase of art that's well known in this area? Yes. Yes, Your Honor. All right. What about the other one? Before you leave that one, can I ask a question? You've got, independent of that, do you have an ADA claim if the only thing that you're claiming with respect to the gallbladder? I mean, she's got a clogged bile duct, and the gallbladder is removed. By definition, can you have an ongoing clogged bile duct if your gallbladder is gone? Can I ask for clarification on your question? Are you asking if the condition ever qualified as a disability or whether it currently qualified as a disability at the time she was terminated? As of the time that she was supposedly the subject of adverse employment action, her testimony was she was better, which kind of stands to reason because she didn't have a gallbladder anymore, so she couldn't have a clogged gallbladder duct. So independent of determinative factor and whether you raised it or not, how can you have an ADA disability claim, not talking about retaliation, disability, when the only disability claim with reference to her GI problems was the thing associated with her gallbladder, which the cholecystectomy, if I've got that right, resolved because it took the gallbladder out. I believe the answer to that lies in the same question that we're having about the temporal proximity and the timeline, and it's up to the fact finder to determine. The only testimony is her testimony saying I was better. You've got nothing else. Because she also testified, though, that as soon as she got back from being disabled, even if we accept that when she came back she was better and she was no longer disabled, she said when she got back, instantly the environment changed. That's a retaliation claim. That's different. That's why I said set the retaliation claim aside. We're not talking about that. We're talking about the ADA disability claim, but I think I got your answer on that. Okay, I'm sorry. Go ahead. I'm sorry. I need to bring you back to my original question. I feel like we're not on the same page here. So I asked you to tell me where you raised the issue challenging the district court's alternative holding for the ADA discrimination claim that her alleged disabilities were not a determinative factor in the decision to terminate her. And as I understood your answer, you pointed me to pages 23 and 24 of your brief, correct? Yes. And you basically said that the causation issue is the same thing as determinative factor, even though you didn't mention determinative factor, correct? Correct. Please tell me what the point heading says. Please read for the court on page 23 your point heading C, which is the section that you directed me to in response to my question about the ADA discrimination claim. The district court erred in denying appellant's retaliation claim by finding that appellant failed to establish causal connection between that. So I asked you a question about the discrimination. I feel like I'm chasing you around the courtroom here. I asked you a question about the discrimination claim, and you answer it, and you sort of pivot to causation. You get me a little confused. And then what really you're doing is you're pointing me to something that's totally separate than your discrimination claim, correct? Your Honor, allow me to apologize because I think I might have misunderstood your question because I was focused on the essential element and how that it's the same question for retaliation and discrimination, but for talking discrimination only. You're correct. I did not raise that. So that's why. So I apologize for that. All right. Well, thank you. I appreciate that. Thank you for conceding that.  Then let's talk about retaliation because my question on retaliation as to whether this is a live issue does not relate to determinative factor or causation. The alternative holding on ADA retaliation was that your client did not engage in protected employee activity. So where in your brief can you show us that you challenged that holding of the district court? I did not challenge the alternative holding, Your Honor. All right. Thank you. Well, that's so helpful because now, at least for my purposes, I can focus on what I think is live in this case, which is your FMLA retaliation claim. Now, could you help me with what I was asking Ms. Rickabaugh? And did I correctly understand your argument that this is a good FMLA retaliation case that needs to go to a jury? Summary judgment was improper because what happened is your client is sick, she needs an operation, she takes what she's legally entitled to in the form of FMLA leave, and then when she comes back three months later, she's fired. Correct. Okay. Under our case law, you'd have a really strong argument if she got back from FMLA leave and a week later she was fired because that's right in the heartland of our temporal proximity jurisprudence, correct?  But the three months doesn't really help you. It helps the hospital more. So what else do you have under our precedence? You may make an argument that our precedence aren't right, that three months should be tight enough, but we have to take our precedence as we find them. Understood. And while I would make that argument, and I understand in other jurisdictions, it would be here it's important to note that temporal proximity alone is not what I'm arguing.  So then help us out. What else do you have besides the three months? What I would say about what the precedence states, it isn't that if it's three months then you don't look at temporal proximity at all. It's that you have to show temporal proximity plus the pattern. Right. What's the plus? The pattern of antagonism, and if I can indulge the court by repeating myself, it's what the plaintiff has laid out as the timeline of events, and again you get to use the Fuentes standards, which is the implausibilities, inconsistencies, incoherencies, and contradictions along the way in that timeline to their non-retaliatory reason. So the inferences can be drawn based off of, as Judge Jordan illustrated during the questioning of the appellee, that she was an exceptional employee, that she was being considered for a promotion, and that changed. All right, but now you've got me confused because I thought you were going to say cat's paw. I thought you were going to say the FMLA retaliation is that even though Ms. Saunders didn't know about the leave, because that would break a causal chain. Yes. But you said I've got cat's paw. Is that your argument? That's how it ends. All right, then please point to me in your opening brief or your reply brief where you talked about cat's paw. Again, I don't believe that I used the term cat's paw, but I focus on my statement of facts about how Ms. Saunders did not have the adequate information in front of her, did not look into these. Then show us where Menke put Saunders in motion without using the phrase cat's paw. Show us in your briefing either of the two briefs where you point us to record evidence that would support the notion that Saunders was acting as Menke's vehicle. So if you go to the end of page 11. Is this the opening brief? Yes, the opening brief, my facts. Okay. Again, I would concede that it requires an inference, but what I was trying to illustrate here is that this investigation, which starts with Menke and carries on, that the final fatal aspect, the last step of it was Elise Saunders' review. So Elise Saunders, and here I outline how she was reviewing Menke's suggestion for termination. If that's unclear on that, then that's a mistake in my drafting, Judge, but by highlighting it as the final fatal aspect, I'm trying to set the timeline that it went from Menke, and I talk about the flaws that Menke had in the investigation, and then it passes on to Saunders as the final step. Well, you do a good job, I think, in page 11, of showing us where Saunders did a poor job or was perhaps negligent, following up on what Judge Porter said earlier, but I don't see anything connecting that sort of shoddy effort by Saunders to Menke. It's in – I can represent to the Court that it's in Saunders' deposition testimony, which is in the record, and I'd be happy to supplement with the exact Keysight testimony that states that basically Saunders reviewed everything that Menke did and it was the person that signed off on it. Is it in your briefing that Menke is the one who contacted Saunders? Again, the way I phrase it, Judge, was that Saunders was the final person. I don't know if I put that final point of it that Menke picked up the phone and called Saunders. It's this – what Saunders testified to that it was her job in Human Resources to review the investigations and that she reviewed what was already done, and by only describing it as the final aspect, I mean I put a fine enough point on it that literally carries it from, but by what I was trying to illustrate in this was that it went from Menke and the final stop was Saunders' desk and that that's how it went. And again, if – It's an interesting argument. It's sort of a constructive knowledge argument. It sounds like you're saying that by virtue of Saunders' job, she's charged with knowledge of what the other folks did, and if she didn't look at the file, then you're entitled to some negative inference or something there, but – It also – I don't remember seeing any cases like that. It sounds like a new argument that might have some legs, but that's not really teed up here for us. It goes into, too, what an employer's duty is under the FMLA and the FADA, that the employer can't just put blinders on and just say, oh, well, I didn't even open the personnel file. Is that the argument? Because that really wouldn't be a new argument. I thought the argument you were making here at the podium, this cat's paw argument, was Manke had it in for your client and Manke engaged Saunders and said, look, she's lying on her time card. What am I supposed to do? Yes. I thought that was your pitch. I believe there's multiple layers to it, Judge. I believe that a fact finder could find, yes, that Manke gave her incomplete information so she would sign off on the investigation. I believe that it shows that CHOP didn't take anti-discrimination and anti-retaliation seriously, which is something that Jory could use to infer that all of this was discriminatory or retaliatory. And it shows, again, it fits with the theme that if this was a great employee that was up for a promotion, why did she get such a half-hearted process to terminate her, where the final person. When you say a half-hearted process, if somebody really believes they're getting lied to and they're getting lied to by somebody who they put in a supervisory position, is it really half-hearted to say, that's it, I can tolerate a lot of stuff from you, but I can't tolerate you lying to me, especially not when I put you in a responsible position over other people. You're out. I mean, you say it's half-hearted, but if they believe she's lying, their own policy tells her in advance, you lie, that's a fireable offense, just like that. I think that question goes back to what Your Honor said was putting the finger on the issue, was that in order to believe they were sincere in their belief she was lying, the fact finder has to make a credibility determination. They have to prove that when they say, well, we believe they were lying, that that's more credible than Erin Coleman's testimony that, well, I was told the exact opposite from them, I always did it this way, I was never warned, what's more credible? Is it their belief that they were lying, despite the fact that they can't point to a policy that she was lying about, that they can't point to anything written down that shows that she was supposed to do things a certain way? Is that more credible, that they had the sincere belief that she was lying? Or is Ms. Coleman's version more credible, that I was told everything was fine until I went out on medical leave, and then all of a sudden I don't even get a chance to defend myself? They can't even produce the policy. And it goes to, if I may, there was one point I did want to rebut that they said that I didn't have an opportunity. We've got a long time here, but if you need another 30 seconds, fire away. Sure. I just want to dispel Appellee's position that it's only plaintiff's testimony. And, in fact, there was a specific claim, if she thought she could work from home, she could have went and got testimony from another colleague. We did that. It's in the brief. Holly Sabatino testified. We have Erin Coleman testifying, I was told I could work from home. We have Megan Mankey saying she could only work from home for specific reasons. I don't disagree in that there could be work from home. This all comes down to one thing. They're saying she's a liar. She was effectively stealing from us and saying that she was on site when she wasn't. And that's the problem. And you're saying that didn't happen that way. So I think we got your position. Okay. We appreciate everybody's arguments. We appreciate the brief.